FILED
04/30/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2018 Session

# IN RE KAH'NYIA J., ET AL.[1]

**Appeal from the Circuit Court for Robertson County
No. 74CCI-2015-CV-617    Ross H. Hicks, Judge**

_____

## No. M2017-00712-COA-R3-PT

_____

A Mother and Father appeal the termination of their parental rights to their son on the grounds of abandonment by failure to support, substantial noncompliance with a permanency plan, and persistence of conditions. Father also appeals the termination of his rights on the ground of failure to provide prenatal support, and Mother also appeals the termination of her rights to her daughter on the grounds of abandonment by failure to support, substantial noncompliance with a permanency plan, and persistence of conditions. Upon a thorough review of the record, we reverse the termination of both parents' rights on the ground of persistence of conditions, and the Father's rights on the ground of failure to provide prenatal support; we affirm the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in
Part and Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

H. Garth Click, Springfield, Tennessee, for the appellant, Darroll L.

Ami L. Brooks, Springfield, Tennessee, for the appellant, Rhonda J. L.

John E. Evans, Springfield, Tennessee, for the appellees, Brett K. and Tisha K.

Susan R. Mader, Nashville, Tennessee, as the Guardian *ad Litem*.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

Rhonda L. ("Mother") is the biological mother of Kah'nyia J., born in October 2011. On September 13, 2013, Mother was arrested and charged with the sale of drugs in a school zone;[2] at the time she was arrested she gave Ashley S. her friend and neighbor (herein "Ms. S."), what has been characterized as a "power of attorney" for Kah'nyia so that Ms. S could care for Kah'nyia while Mother was incarcerated.

Mother gave birth to Darroll L., Jr. ("Darroll Jr."), in January 2014, while she was incarcerated; Ms. S also took Darroll Jr. into her home, although the manner in which this happened is not clear in the record. Darroll L. ("Father") is the biological father of Darroll Jr.; although the record is not clear, it appears that Father was arrested at or about the same time as Mother on the same charge and was also incarcerated on the date Darroll Jr. was born.

On March 11, 2014, the Tennessee Department of Children Services ("DCS") received a report that Ms. S. was physically abusing the children. On March 12, a representative or representatives of an organization known as Jonah's Journey came to the jail, and Mother executed a document, also characterized in the record as a power of attorney, agreeing to place Kah'nyia and Darroll Jr. with Brett and Tisha K. ("Petitioners").[3] At some point DCS filed an Emergency Petition in Davidson County Juvenile Court to have the children declared dependent and neglected, and Petitioners entered into an immediate protection agreement with DCS, resulting in the children being placed in Petitioners' physical custody on March 13, where they have remained.[4] At a

---

[2] Mother was indicted on December 17 for sale of a controlled substance; she pled guilty and was sentenced in Davidson County Criminal Court to three years of incarceration.

[3] Brett K. testified that Jonah's Journey:

> [W]as for women who gave birth while they were incarcerated, typically prison, because it was a longer time, and it was for women to not have -- to have another opportunity, rather than place them in the State's foster system. They asked families to facilitate, as much as they could, to visit while the mothers were in jail, every other week, as much as possible, and that was it. They gave no guidance or no direct guidance to us, as far as how to have a relationship. It was simply family taking care of generally an infant, who was just born, while the mother was incarcerated so the child did not get lost in the foster system.

[4] The only matters from the dependent and neglect proceeding that are a part of the record of this appeal are (1) a May 19, 2014, document styled "Family Service Decree Note Form" which recites that a hearing was held on that date at which Mother agreed to temporary custody being given to Petitioners (Mother verified this in her testimony at the termination hearing); (2) an December 18, 2014, order adjudicating

hearing on May 19, the court granted temporary legal custody of the children to Petitioners. On September 2, Petitioners filed an intervening petition in the dependent and neglect proceeding. On October 3, 2014, a child and family team meeting was held, and a permanency plan was developed (the "permanency plan"), setting out Mother and Father's responsibilities and the tasks they needed to complete during and after incarceration to regain custody of the children.

A hearing was held in the dependent and neglect proceeding on December 9, 2014, and the court entered an order on December 18 (the "December 18 Order"), stating in part:

> Upon agreement of the parties in open court and the record the Court made the following findings of fact:
>
> 1. Kah'nyia J[.] and Darroll L[.], (hereafter the "Minor Children"), were originally placed in the home of the Intervening Petitioners on March 13, 2014 pursuant to an immediate protection agreement from the Department of Children's Services after their investigation regarding physical abuse.
>
> 2. On May 19, 2014, this Court granted temporary custody to the Intervening Petitioners based on agreement reached by the parties and a positive report by the Department concerning the Intervening Petitioners.
>
> 3. On September 2, 2014, the Intervening Petitioners filed their intervening petition.
>
> 4. Since having custody, the Intervening Petitioners have taken care of all medical and health needs Darroll [ ], Jr. He currently is in the eighty-fifth (85th) percentile for his weight, is able to pull himself up, and his fractures are healing. Also, Kah'nyia is participating in speech therapy and preschool.
>
> 5. The Mother has an extensive criminal history including convictions for robbery, driving on suspended license, use of stolen plate, facilitation of sale of drugs, etc. She is currently incarcerated on a violation of probation charge. On August 29, 2014 the Mother pled guilty to the sale of a controlled substance and received a three (3) year sentence. The Mother stated she expected to be released from prison within a few days within December 2014.

---

the children to be dependent and neglected and continuing their placement in Petitioners' legal custody; and (3) the permanency plan developed October 3, 2014.

6. The Father has an extensive criminal record including convictions for criminal trespass, drug possession with intent to sell cocaine, sale of cocaine, drug free school zone, unlawful use of drug paraphernalia, theft of merchandise, theft of vehicle, criminal impersonation, kidnapping risk of bodily injury, burglary. The Father remains incarcerated, but stated he expected his release date to be sometime in December 2015.

7. Neither parent has stable housing or stable employment.

8. The Minor Children have a strong bond with the Intervening Petitioners due to the Intervening Petitioners being the primary caregivers.

9. On October 3, 2014 a child and family team meeting was held and a non-custodial permanency plan developed to provide guidance on services and actions steps the Mother and Father need to complete before regaining custody of the Minor Children.

10. The Intervening Petitioners have cooperated with the Court and the Department of Children's Services. They continue to facilitate agreed upon visitation with the Minor Children and the Father and Mother.

11. It is the desire of the Intervening Petitioners to be granted full legal custody of the Minor Children. The Intervening Petitioners have been married for eight (8) years. They both have full-time stable jobs. . . . . They have a spacious . . . home that provides the Minor Children with their own space. The Intervening Petitioners are active [church] members . . . and have no criminal history. The Intervening Petitioners have a strong family support group that can assist with the Minor Children. Therefore, the Intervening Petitioners are fit and able to provide to permanency for the Minor Children.

Based on these findings, the court: (1) adjudicated the children to be dependent and neglected, (2) ordered that Petitioners retain custody of the children, (3) incorporated the Permanency plan, and (4) ruled that Mother would have until September 2, 2015, and Father would have until September 2, 2016 "to work services and action steps outlined in the non-custodial permanency plan to regain custody" of their respective children.

Mother was released from prison on July 29, 2015, and Father was released on August 13, 2015; on August 24, Mother filed a *pro se* motion in Davidson County Juvenile Court, requesting full custody of the children. A hearing on the motion was continued several times; on December 14, before Mother's motion was heard, Petitioners filed the petition to terminate the parental rights of Mother and Father in Robertson

County Circuit Court that is at issue in this appeal, and the juvenile court stayed the dependent and neglect proceeding.

As grounds for termination of both parents' rights, the petition alleged abandonment by failure to provide support or visit the children, substantial noncompliance with the permanency plan, and persistence of conditions; in addition the petition alleged failure to provide prenatal support as a ground for termination of Father's rights to Darroll Jr.[5] Mother and Father both filed *pro se* answers; in due course, the trial court found them to be indigent, appointed counsel for each, and amended answers were filed on behalf of both. The court also appointed a Guardian *ad Litem*.

The case proceeded to trial, and the court entered an order on March 7, 2017, terminating Mother's and Father's rights to both children on the grounds of abandonment by failure to support (Tenn. Code Ann. § 36-1-113(g)(1)), substantial noncompliance with the permanency plan (Tenn. Code Ann. § 36-1-113(g)(2)), and persistence of conditions (Tenn. Code Ann. § 36-1-113(g)(3)); further, the court terminated Father's rights to Darroll Jr. on the ground of failure to provide prenatal support (Tenn. Code Ann. § 36-1-113(g)(9)). The court also found that termination of Mother's and Father's rights was in the children's best interest.

Mother and Father appeal; each contends that neither the grounds for termination found by the court nor the finding that termination of their rights is in the children's best interest is supported by clear and convincing evidence.

## II.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

---

[5] The petition named the "Unknown Fathers" of Kah'nyia as respondents; no answer or other appearance was made on behalf of Kah'nyia's father, and those rights are not at issue in this appeal.

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.*

In the Memorandum Opinion and Order, the court made credibility findings as to Mother and Father and Petitioners. As noted in *Kelly v. Kelly*, deference to a trial court's determination of witness credibility is substantial, and our review of those determinations is substantially limited:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are uniquely positioned to observe the demeanor and conduct of witnesses. Appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. In order for evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness.

445 S.W.3d 685, 692-93 (Tenn. 2014) (citations omitted).

## III. ANALYSIS

### A. Abandonment by Failure to Support

Abandonment is identified as a ground for termination in Tennessee Code Annotated section 36-1-116(g)(1) and defined at section 36-1-102(1)(A), which reads in pertinent part:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

The court made the following findings relative to the ground of abandonment by failure to support:

i. The Mother and Father never paid any financial support in August-December 2015, which were the four (4) months preceding the filing of the petition.

ii. Tenn. Code. Ann. § 36-1-102(1)(H) states "Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children."

iii. The Father testified he was already paying child support on a previous child, so he had direct knowledge of his responsibility to pay child support for any child. Neither the Mother nor the Father presented any testimony or evidence that they did not know they needed to pay child support.

iv. The Mother and Father both testified that they had no issues obtaining employment. Also, they testified they had no physical ailment or disability that prevented them from working and earning money. Although, their work history appears to be unstable by the number of jobs they held in a short amount of time, it is clear to the Court that the Mother and Father had no trouble finding work and there was no reason they could not provide financial support to their children. The parents testified that they were working and saving money not only for obtaining lodging, but also to get necessary furnishings, clothing, incidentals and an automobile to reestablish themselves. While it is understandable that these things were indeed necessary for them to reestablish themselves, they nonetheless chose not to devote any of their financial resources to the support of the children. It is clear the Mother and Father willfully chose not to support their Minor Children despite the ability to do so.

v. The Mother and Father admitted they paid no child support during this time period. They stated they offered, but were told by the Petitioners no money was needed.

7

vi. The Petitioners testified that the testimony of the Mother and Father was not truthful. The Petitioners testified that Father and Mother never offered to pay any financial support for the Minor Children. The Mother and Father's testimony was contradicted on many issues, including this issue, and the Court finds Petitioners testimony on this issue to be more credible than that of Mother and Father.

On the basis of these findings, the trial court ruled that Mother and Father:

[A]bandoned the Minor Child as defined in Tenn. Code Ann. § 36-1-102(1)(A) as they have never been a source of financial, physical, or emotional support for the Minor Children. For a period of four (4) consecutive months immediately preceding the filing of the original petition, as well as immediately preceding the filing of the amended petition, the Respondents willfully failed to provide monetary support of any kind for the Minor Children.

Mother and Father argue that the court erred in finding that their failure to pay support was willful and that their attempts to provide support were rejected by Petitioners.

A failure to provide support is not sufficient, on its own, to establish abandonment; that failure to support must be willful. A failure to support is "'willful' when a person [1] is aware of his or her duty to visit or support, [2] has the capacity to do so, [3] makes no attempt to do so, and [4] has no justifiable excuse for not doing so." *In re Audrey*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (footnote omitted). Further, this court has recognized:

Willfulness of a parent's conduct depends on the parent's intent, and intent is seldom capable of direct proof. *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004)). Triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *Id*. Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are best situated to make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d at 367. The question of intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness. *V.D. v. N.M.B.*, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, at *6 (Tenn. Ct. App. July 26, 2004).

*In re Alysia S.*, 460 S.W.3d 536, 566 (Tenn. Ct. App. 2014).

### 1.      Awareness of Duty

With respect to this element, Mother argues that her failure to pay support was not willful because "[t]here was no Court Order for child support."  Contrary to Mother's argument, the law is clear that "[t]he obligation to pay support exists even in the absence of a court order to do so." *State Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523–24 (Tenn. Ct. App. 2004) (citations omitted).  Moreover, '[a]ll parents have a duty to support their children," *In re M.J.B.*, 140 S.W.3d 643, 655 (Tenn. Ct. App. 2004), and "[e]very parent . . . is presumed to have knowledge of a parent's legal obligation to support such parent's child or children."  Tenn. Code. Ann. § 36-1-102(1)(H).  Accordingly, Mother is deemed to be aware of that obligation.

The trial court found that Father was making child support payments for his other children, which made him aware of his responsibility to pay support.  This holding is supported by Father's testimony that he is paying "just under $800 a month" in child support for two other children.

### 2.      Capacity to Pay

The trial court made the following findings relative to Mother's and Father's capacity to support the children:

> iv. The Mother and Father both testified that they had no issues obtaining employment. Also, they testified they had no physical ailment or disability that prevented them from working and earning money. Although their work history appears to be unstable by the number of jobs they held in a short amount of time, it is clear to the Court that the Mother and Father had no trouble finding work and there was no reason they could not provide financial support to their children. The parents testified that they were working and saving money not only for obtaining lodging, but also to get necessary furnishings, clothing, incidentals and an automobile to reestablish themselves. While it is understandable that these things were indeed necessary for them to reestablish themselves, they nonetheless chose not to devote any of their financial resources to the support of the children. It is clear the Mother and Father willfully chose not to support their Minor Children despite the ability to do so.

In their briefs, neither Mother nor Father cites evidence which they contend preponderates against the finding; rather they challenge the sufficiency of the evidence to support the ground.  Upon our review, the testimony supports the findings.  The evidence shows that Mother and Father were employed for the majority of the pertinent time period and were receiving income and, therefore, had funds with which to support the

children.[6]   In addition, in the court's specific credibility findings, the court noted that, contrary to Mother's testimony, she received food stamp benefits for Kah'niya during the period July through December 2015, even though she did not have custody of her; Mother does not dispute this finding.

### 3.    Attempt to Pay

The trial court made the following findings relative to Mother's and Father's attempt to pay support to Petitioners:

> v. The Mother and Father admitted they paid no child support during this time period. They stated they offered, but were told by the Petitioners no money was needed.

> vi. The Petitioners testified that the testimony of the Mother and Father was not truthful. The Petitioners testified that Father and Mother never offered to pay any financial support for the Minor Children. The Mother and Father's testimony was contradicted on many issues, including this issue, and the Court finds Petitioners testimony on this issue to be more credible than that of Mother and Father.

Mother and Father both testified that they made attempts to pay support to Petitioners but were rebuffed.   Contrary to Mother's and Father's testimony, both Petitioners testified that they received no support from Mother or Father.   The court heard the conflicting testimony and resolved the conflict when it made the following specific credibility finding:

> b. The Mother and Father testified that they offered money to the Petitioners for child support. However, both the Petitioners testified that no such offer was made. More significantly, no such payments were ever made.[1]

> [Footnote 1: "Father testified that he sent some money at Halloween but offered no evidence to support his bare testimony in this regard. Father also testified that he pays monetary support for other children of whom he is the biological father."]

---

[6] The petition to terminate their rights was filed on December 14, 2015.  Mother was released from jail in July 2015, and Father was released in August of the same year; each testified that they worked at Standard Candy Company from August 2015 through January 2016, when they were fired because they were fighting and arguing at work.  As noted by the trial court, Mother and Father testified that they saved their earnings.

Affording the credibility determination the deference required we hold that the supports the finding that neither Mother nor Father attempted to pay support.

### 4. Excuse for Not Paying

Other than the general adverse credibility finding, the court did not make a specific finding as to this element; the parties do not specifically address this element in the briefs. Upon our review, there is no evidence in the record from which to conclude that Mother and Father had a justifiable excuse for their failure to pay support.

From our review of the record, the evidence clearly and convincingly shows that Mother's and Father's failure to pay support was willful, and that the ground of abandonment by failure to support was established.

### B. Noncompliance with the Permanency Plan

Relying on *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561 (Tenn. Ct. App. March 12, 2013), and *In re Alysia S.*, 460 S.W.3d 536, Mother and Father argue that substantial noncompliance with a permanency plan cannot be used as a ground for termination because that ground is only applicable if the permanency plan is developed within the context of the children being in foster care with DCS. Petitioners argue that this ground for termination applies "since the non-custodial perm plan used in this case is identical in every way to a perm plan except for its title." Upon our review of the record and in accordance with applicable law, for the reasons set forth hereinafter, we have determined that noncompliance with the permanency plan is available as a ground for termination.

Tennessee Code Annotated section 36-1-113(g)(2) authorizes a court to terminate parental rights when there is "substantial noncompliance . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4."[7] Tennessee Code Annotated section 37-2-402(9) defines a "permanency plan" as "a written plan for a

---

[7] Part 4 of Chapter 2 is entitled "Foster Care"; section 37-2-401, *inter alia*, sets forth the legislative intent. Pertinent to this case, subsections (a) and (b) state:

> (a) The primary purpose of this part is to protect children from unnecessary separation from parents who will give them good homes and loving care, to protect them from needless prolonged placement in foster care and the uncertainty it provides, and to provide them a reasonable assurance that, if an early return to the care of their parents is not possible, they will be placed in a permanent home at an early date.

> (b) The secondary purpose of this part is to provide a mechanism to monitor the care of children in foster care to ensure that everything reasonably possible is being done to achieve a permanent plan for the child.

child placed in foster care with the department of children's services or in the care of an agency as defined in subdivision (3) and as provided in § 37-2-403." In turn, "agency" is defined at section 37-2-402(3) as "[a] child care agency, as defined . . . in chapter 5, part 5 of this title, regardless of whether such agency is licensed or approved,. . ."; section 37-5-501(b)(5) defines "child care agency" as "the person or entity that provides child care, regardless of whether such person or entity is licensed."

The evidence and testimony clearly shows that Petitioners are providing the children with "child care."[8] When they were placed in Petitioners' home, Kah'nyia was under three years old and Darroll Jr. was just a few months old. Petitioners have provided a home for the children and for them to attend daycare and a headstart program. The Domestic Adoptive Parent Homestudy[9] reports that both children exhibited evidence of developmental delays when they came into the home, and Petitioners have "ensured that [Kah'nyia] has received speech and physical therapy for her delays and counseling for losses and her history of neglect and abuse….[Darroll Jr.] appears to be developmentally on target…." Even though the children are not in custody of DCS, the testimony established that the Petitioners have been approved to be foster parents, and representatives of Jonah's Journey offered them the same advice and guidance given to foster parents.

DCS became involved with the children on March 11, 2014, after the Child Protective Services division received a report that Darroll Jr. had been abused. DCS initiated an emergency petition to gain custody of the children and to have them declared dependent and neglected. Contemporaneously with DCS' effort, representatives of Jonah's Journey secured Mother's consent to place the children with Petitioners which led to DCS entering into a protection agreement with the Petitioners; this placement was approved by the juvenile court after DCS "vouche[d]" for the placement. Until Petitioners intervened in September, DCS was the only party to the dependent and neglect proceeding; a family service worker and supervisor from DCS held the October 3 meeting where the permanency plan was developed; the plan was made a part of the December 18 Order. Pursuant to the requirements of the plan, the DCS family service worker referred Mother for a parenting assessment to an organization called "Parenting Solutions."

---

[8] "Child care" is defined at Tennessee Code Annotated section 37-5-501(b)(4) as "the provision of supervision, protection and the basic needs of a child for twenty-four (24) hours a day including the provision of such temporary services to a child awaiting placement in permanent care."

[9] This study, introduced without objection at the termination hearing, was prepared by Lisa Mosley and Carole Ozment, employed by Adoption Assistance, Inc.; the attestation on the report states that Adoption Assistance is "a licensed Child-Placing Agency in the State of Tennessee" and that the conclusions in the report were reached "in accordance with the Child Welfare Standards and Tennessee Code Annotated §§ 37-4-201—207."

In *In re Kaleb N.F.,* this court held that section 36-1-113(g)(2) was not appropriate "where DCS did not take the child into State protective custody, did not create a 'permanency plan' that satisfied the requirements of the statute, did not obtain court approval of any permanency plan, did not include in the permanency plan notification to Mother of the criteria for termination and the consequences of failing to comply with the DCS plan, and did not undertake to provide reasonable efforts to assist Mother." 2013 WL 1087561 at *21. The question presented in this appeal—whether "the ground of substantial noncompliance may be ever relied upon by private parties, such as prospective adoptive parents who seek to terminate the parental rights of a child's biological parent"—was specifically left open. *Id*. The record in this case shows that, coupled with the substantial involvement of DCS, the care in which these children were placed qualifies as "foster care with [DCS] or in the care of an agency" within the meaning of section 37-2-402(9), such that this ground for termination is available to Petitioners. Accordingly, we proceed to examine whether there is clear and convincing evidence to support the court's findings or whether the evidence preponderates against those findings.

The court held that Mother's and Father's noncompliance with the permanency plan related to three areas: use of drugs; the children's physical safety needs; and the children's emotional and developmental needs. We discuss the evidence relative to each area in turn.

1.    **The use of drugs**

The permanency plan stated that "after completing their respective periods of incarceration, [Mother and Father] will submit to random drug screens which will be conducted by their probation/parole officer, or the Davidson County Juvenile Court. FSW will assist with random drug screens, if necessary while the family case is open with this department." Further, the Plan encouraged, but did not require, Mother and Father to attend Narcotics Anonymous meetings at least once per week. The trial court found that Mother and Father "continue to use both illegal drugs and prescription drugs inappropriately," "never attended narcotics anonymous meetings," and did not have random drug screens, in violation of the permanency plan.

Mother argues that the evidence preponderates against the trial court's findings because she lives a "drug free lifestyle." She testified that she does not have a drug problem; that in the year before her testimony she did not abuse any illegal drugs; that neither Petitioners, the Guardian *ad Litem*, nor the juvenile or trial court ever requested that she take a drug screen; and that she has passed drug screens which she was required to take for employment purposes.[10] Further, Mother testified about and introduced as exhibits certificates of completion of two substance abuse classes while she was

---

[10] No documentary evidence of these drug screens was entered into evidence.

incarcerated. Petitioners did not introduce any testimony or other evidence that Mother had used drugs since the permanency plan was put in place. The evidence does not support the finding that Mother was not in compliance with this requirement of the permanency plan; accordingly, we reverse the finding.

Evidence of Father's drug use came from his sister, Mary W. (herein Ms. W.), and Father. Ms. W. testified Father has had "substance issues" and that she is familiar with how Father acts when he is using illegal narcotics. She testified on both direct and cross examination that Father had told her that he had used cocaine since his release from jail and that he showed signs of cocaine use, including not taking a shower, being more tired than usual, and not being his normal self in general. Father testified that he had not used any illegal drugs since being released from jail. The trial court resolved the conflict in testimony in its credibility findings:

> 10. The Court also finds that some testimony of the Mother and Father is not credible. For example:
> * * *
> e. The Mother and Father testified that they did not do any illegal drugs since leaving jail. [Ms. W.] testified that the Father was doing drugs, including cocaine, since leaving jail. [Ms. W.] testified that she knows the physical signs of drug use on her brother, the Father. She said the Father admitted to her directly that he was doing drugs again. [Ms. W.] knew the Father meant cocaine based on his history.

Ms. W.'s testimony, which the court determined to be credible, is clear and convincing evidence of Father's drug use; his testimony to the contrary does not preponderate against the court's finding.

### 2. The physical safety needs of the children

The permanency plan required that Mother and Father apply for public or other suitable housing, "[p]rovide proof of residence with all utilities for a period of three (3) consecutive months," and "be able to utilize and demonstrate proof of their methods of legal transportation. This will include but is not limited to Metro Trans Buses, valid driver's licenses, registered vehicles, with proof of current insurance." The trial court found:

> aa. The Respondents made no reasonable efforts to provide a suitable home and demonstrated a lack of concern for the Minor Children to such a degree that it appears unlikely they will be able to provide a suitable home for the Minor Children at an early date. Placement of physical and/or legal custody of the Minor Children with the Respondents would pose a risk of

14

substantial harm to the physical or psychological welfare of the Minor Children.

The evidence relative to this area of inquiry consisted of testimony of Mother, Father, and Ms. W. Mother testified that she and Father lived in a two-bedroom duplex with a basement apartment from October 2015 through the date of trial. Their lease was admitted as an exhibit, showing that Mother and Father agreed not to allow any person to stay at the residence for more than five days without providing notice to their landlord. Mother testified that she had a friend who stayed at the residence for around two weeks, that the friend invited others to the residence despite being told not to, and that the police eventually had to be called to remove the friend from the residence. Mother further testified that she and Father "once or twice" had someone stay with them for a couple of weeks until that person could find a place of their own, and that Mother and Father notified the landlord about the person staying. Ms. W. testified that her son resided with Mother and Father for at least seven or eight months in the past year.[11] Upon our review, the testimony is not clear and convincing evidence that Mother and Father made no reasonable effort to provide a suitable home for the children or that it is unlikely that they would be able to provide a suitable home, and we reverse the finding in that regard.

The trial court also found:

bb. The Mother and Father continue to have drug and domestic violence issues. They continue to violate their lease by having other adults live with them, and they risk having utilities disconnected. The evidence was clear that neither the Mother nor Father have provided a suitable or stable home.

The evidence relative to this area of inquiry consisted of testimony of Mother, Father, and Ms. W. Mother testified to two incidents in which the police had to be called to the residence because of a dispute between her and Father. The first incident occurred when Mother left the house following an argument, and upon her return, Father would not let her into the house, causing her to call the police; Father testified that he did lock Mother out, and that he needed some time "to cool off" after the argument. A second incident occurred when Mother was at home and wanted to leave, but was prevented by Father; Mother called the police. Mother also testified to an incident when she and

---

[11] The court resolved the discrepancy between Mother and Father's testimony that they only had a couple of people stay with them for a couple of weeks and Father's sister's testimony that her son lived with Mother and Father for over seven months by making the following credibility determination:

c. The Mother and Father testified that no other adult lived with them longer than five (5) days as allowed for in their lease, which was admitted as Exhibit 9. However, [Ms. W.], the Father's sister, testified that her own son lived with the Mother and Father for the better part of a year.

Father got into an argument at the Standard Candy Company, where they both worked; the employer called the police, and they both lost their jobs as a result. Ms. W. testified that several times she witnessed Father with scratches and bruises, and when asked about the source of the injuries, Father explained that they were result of fighting with Mother. Mother and Father were responsible for electricity at the residence, and the bill for August/September 2016, introduced at trial, showed that Mother and Father were late on their payment of the bill and faced termination of services if not paid. Mother testified that the electricity was not disconnected, but that they still owed an unpaid balance.

The testimony is clear and convincing evidence in support of the finding of continued domestic violence and the risk of loss of electricity; in addition, as noted earlier, the court found that Father was still using drugs. While there is testimony that adults were allowed to live in the residence for more than five days, Mother testified that the landlord was notified; there is no evidence to the contrary; the evidence that Mother and Father violated their lease is not clear and convincing.

cc. The Mother and Father testified they did not have a working car

Mother and Father both testified that they previously had a car with which they had problems, but that they owned a working vehicle at the time of trial; there was no testimony or other evidence to the contrary. This testimony preponderates against the court's finding that they did not have a working vehicle; accordingly, we reverse the finding.

dd. The Mother has picked up at least two driving on suspended/revoked license charges, and did not have a valid license.

Mother testified that due to unpaid court costs, she has had her driver's license revoked; since being released from jail Mother has been cited for driving on a suspended license twice. She also testified that she did not, at the time of her testimony, have a valid driver's license. Mother's testimony is clear and convincing evidence in support of this finding.

ee. The Mother testified that there are still thousands of dollars of unpaid court costs. Also, neither the Mother nor the Father paid anything toward the $50 per month fee assessed for their court appointed attorneys in this matter.

Mother testified that she had around $3,000 in unpaid court costs stemming from her conviction and incarceration, and that she is currently making slow payments to the court to satisfy that debt; Father testified that he has a "couple of thousand" in unpaid court costs. The evidence in the record before us that neither Mother nor Father paid the fifty dollar per month payment the court ordered they pay their appointed attorneys

16

consists of a motion filed on August 30, 2106, by Petitioners requesting, *inter alia*, that Mother's and Father's counsel be removed; the motion stated that "neither the Father not Mother have made any payments toward their attorney fees." There is no order disposing of this motion in the record. The testimony of Mother and Father is clear and convincing evidence that each has unpaid court costs; the evidence does not support the determination that they have not paid the $50 fee for their appointed counsel.

### 3.    **The Children's emotional and developmental needs**

The permanency plan required that Mother and Father "complete a parenting assessment with a mental health component while incarcerated at the department's expense and comply with all recommendations." Relative to this area, the court found:

> aa. The Mother did not comply with her parenting assessment. She did not have the requested psychological examination or intensive parenting classes. The Mother has not dealt with any of her mental health or lack of parenting classes. The Father also has done nothing to address his parenting since leaving jail.

George Merkel, the DCS Family Services Worker, referred Mother for a parenting assessment to Barbara Newman, an assessment specialist with an entity called Family Solutions. Ms. Newman interviewed Mother in jail on October 24, 2014, where she gathered background information on Mother's life, education, history of incarceration, parenting style, skills and relationship with the children, and why they were not in her custody; her assessment was introduced into evidence. In the assessment, Ms. Newman concluded:

> [Mother] presents as having little insight into her current circumstances. She believes she is a victim and has demonstrated little, if any, accountability for her actions. She believes she is a good mother and has done nothing wrong. [Mother] does not seem to connect the dots with her incarceration and her children. She stated during the interview one has nothing to do with the other. She gave her children to a friend to keep while she went to jail. She has revealed that she is stressed and deeply depressed. [Mother] has identified the DCS involvement as a problem she is currently struggling with. [Mother] has revealed she isolates herself when the opportunity presents itself.

> In conclusion, these are clear signs of [Mother]'s psychological wellbeing being impaired. Based on [Mother]'s comments, it is this Assessor's recommendation to explore the condition of her mental health by recommending she completes a Psychological Examination. This examination will provide a more intensive calculation of [Mother]'s

17

psychological standing and further determine her mental health needs, if any, and her competence as a parent. It is this Assessor's recommendation that [Mother] follows all counsel from the psychological evaluation results.

\*\*\*

This Assessor recommends that [Mother] completes intensive individual Parenting Classes for a minimum of 16 weeks to offer her support and to learn additional skill sets to further develop her strengths as a parent. It is further recommended [Mother] follow all counsel and her parenting skills are reassessed at the conclusion of this sixteen-week term.

Mother's testimony on this issue was limited; she testified that she was informed that she needed to undergo a mental health assessment and attend a parenting class. When asked about the parenting class, Mother responded that she completed parenting and substance abuse classes while incarcerated; certificates of completion of three parenting classes and two substance abuse classes were entered into evidence at trial.[12] Mother did not testify as to the specific nature or curriculum of the classes or the extent to which they were the classes that were suggested in the parenting assessment.

There is no evidence that the content of the parenting classes Mother attended while in jail addressed matters which were identified by Ms. Newman in the parenting assessment; Mother testified that she did not take any parenting classes or obtain a psychological evaluation after her release from jail.[13] Mother's testimony and other relevant evidence is clear and convincing evidence that she did not have the psychological examination or the intensive parenting classes recommended by Ms. Newman, as found by the court.

Father testified that he completed several different educational programs while in jail: a parenting program, a drug and alcohol treatment program, and a class entitled "Motivation to Change"; certificates of completion for these classes were entered into

---

[12] The substance abuse certificates were dated October 10, 2013, and April 16, 2014; the parenting class certificates were dated June 4 and 15, 2014, and August 20, 2014.

[13] Pertinent to this issue, Mother testified as follows:

Q. Do you have any other followup about anything else that DCS wanted you to do as a result of your assessment?
A. No. The only thing they wanted me to do was that, something about mental health, and that I needed to take parenting, which I took that three times. But they said it was just the mental health, that they would have to come out and evaluate me. I've never had mental health problems ever.

18

evidence at trial.[14]  Father testified that he completed an "outpatient substance abuse program" after his release from jail, that the program lasted six months, and met once a week for an hour each week; a certificate of completion was entered as an exhibit at trial. Father testified that this outpatient program is the only substance abuse class that he has completed since his release from jail and that he has completed no additional parenting classes since his release.  While Father participated in a substance abuse program since his release from jail, the evidence does not preponderate against the finding that he had done nothing to address his parenting skills.

The court also found:

bb. Since leaving jail, neither the Mother nor the Father have taken any steps towards improving their parenting or stability. On the contrary, the Mother and Father have lived a volatile lifestyle including drug activity and domestic violence.

As noted above, the testimony shows that Mother has not taken steps to comply with the recommendations in her parenting assessment by attaining psychological consultation or engaging in any parenting classes since leaving jail.  Likewise, other than the outpatient class Father attended, there is no proof that he has taken measures to improve his parenting skills or stability since his release.  Further, the testimony reflects that Mother and Father continue to engage in arguments and fights that result in physical conflict, contact with the police, or both.  This finding is supported by clear and convincing evidence.

Reviewing the record as to the ground of failure to comply with the requirements of the permanency plan, there is clear and convincing evidence that Father continues to use drugs, that Mother and Father continue to engage in incidents of domestic violence, that they owe thousands of dollars in unpaid court costs, that Mother has received two citations for driving on a suspended license, and that Mother and Father have failed to address their parenting deficiencies since their release from custody.  This evidence is sufficient to support the termination of Mother's and Father's parental rights on the ground of substantial noncompliance with the permanency plan in the three areas identified by the court.

---

[14] Relative to the substance abuse requirement, Father, who was released from jail on August 13, 2015, introduced certificates of completion of a 45 day intensive alcohol and drug treatment program dated July 23, 2014, and a weekly outpatient group program dated March 22, 2016.  He also introduced certificates of participation in a parent training program dated June 25, 2015, and participation in a "Motivation to Change" program dated July 7, 2015.

## C.    Persistence of Conditions

Parental rights may also be terminated on the basis of persistence of conditions, defined by Tennessee Code Annotated section 36-1-113(g)(3) when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

For this ground to apply, the child must be removed from the home of the parent whose rights are at issue. *In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *9–10 (Tenn. Ct. App. June 23, 2015) (citing *In re K.M.K.*, No. E2014-00471-COA-R3-PT, 2015 WL 866730 at *7 (Tenn. Ct. App. Feb. 27, 2015) (citing *In re Maria S.*, No. E2013-01295-COA-R3-PT, 2013 WL 1304616 at *10 (Tenn. Ct. App. Apr. 1, 2013), as holding, "burden of proof not met where 'the Children were not removed from Father's home' and the father was incarcerated during the pertinent time")).

The proof in this case is clear that, at the time that both children came into DCS custody, they were in the custody of Ms. S, not in that of either parent. As in the *In re Jayden B.T.* decision, we hold that the ground of persistence of conditions is not available as a ground to terminate the rights of either parent, and reverse the court's finding as to persistence of conditions as a statutory ground for terminating Mother's and Father's parental rights.

## D.    Failure to Provide Prenatal Support

The trial court ruled that Father's parental rights should be terminated for failure to provide prenatal support for Darroll Jr. pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A):

The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person . . . , is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

> (i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth.

In its ruling the trial court specifically held that Father was not the legal father of Darroll Jr.; Father argues that the trial court erred in using this as a ground for termination because he is the legal father of Darroll Jr. and section 113(g)(9)(A) only applies to a putative father.

Tennessee Code Annotated section 36-1-102(28) defines "legal parent" as:

(i) The biological mother of a child;

(ii) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;

(iii) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;

(iv) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302, or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(v) An adoptive parent of a child or adult; . . .

Under the facts presented the court correctly held that Father is not the "legal parent" as defined in the statute. Mother and Father acknowledge that he is the biological

father of Darroll Jr., and he married Mother in February 2015, a little over a year after Darroll Jr.'s birth; Mother and Father remain married. Because Darroll Jr., was not born during the marriage, neither subsection (ii) nor (iii) apply. Further, subsection (iv) does not apply because there was no evidence presented that Father had been adjudicated to be the legal father of Darroll Jr. or executed an unrevoked and sworn acknowledgement of paternity.

Tennessee Code Annotated section 36-1-102(43) defines "putative father" as:

"Putative father" means a biological or alleged biological father of a child who, at the time of the filing of a petition to terminate the parental rights of such person . . . meets at least one (1) of the criteria set out in § 36-1-117(c)[15] and is not a legal parent.

---

[15] Tennessee Code Annotated section 36-1-117(c) states:

The parental rights of the putative father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:

(1) The biological father of a child has filed with the putative father registry, pursuant to § 36-2-318, a statement of an intent to claim paternity of the child at any time prior to or within thirty (30) days after the child's birth and has notified the registry of all address changes;

(2) The biological father has been specifically identified to the petitioners or their attorney, or to the department, the licensed child-placing agency, or the licensed clinical social worker involved in the care, placement, supervision, or study of the child as the child's father by the child's biological mother in a sworn, written statement or by other information that the court determines to be credible and reliable;

(3) The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; provided, that if the biological father has previously notified the department of the biological father's claim to paternity of the child pursuant to the putative father registry, § 36-2-318(e)(3), the biological father shall be subject to all the requirements for waiver of notice provisions of § 36-2-318(f)(2) and to all requirements for filing a paternity petition;

The evidence offered at trial shows that Father meets the criteria set out at section 36-1-117(c)(2). Mother and Father both testified that they were in a relationship and living together at the time Mother took a pregnancy test and discovered she was pregnant; they both acknowledged that Father was the biological father of Darroll Jr. There was no evidence to the contrary of their acknowledgements. The evidence fully supports the court's determination that section 36-1-113(g)(9)(A) is applicable to Father, as the putative biological father of Darroll Jr.

We proceed to determine whether there is clear and convincing evidence to support the termination of Father's rights.

The court made seven factual findings relative to this ground. We have determined that six of the findings are not relevant because they address matters arising after Darroll Jr.'s birth. In the remaining finding, the court held:

> b. The Father failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the Minor Child in accordance with his financial means promptly upon the person's receipt of notice of the Minor Child's impending birth.

When questioned about what Father's payment of expenses relating to her pregnancy with Darroll Jr. before they were incarcerated, Mother testified that Father did not give her money to "pay for any doctor visits or prenatal vitamins or anything like that" because she was on TennCare and did not have to pay for her doctors' bills, but that Father paid for out-of-pocket expenses like "prescriptions" and "stuff like that." Father testified that prior to his incarceration he paid for "everything"; when asked to explain, Father clarified that he paid for food and shelter and paid a share of the cost of Mother's

---

(4) The biological father is recorded on the child's birth certificate as the father of the child;

(5) The biological father is openly living with the child at the time the adoption proceeding is commenced and is holding himself out as the father of the child; provided, that if custody of the child has been removed from the biological mother by court order, notice shall be given to any man who was openly living with the child at time of the initiation of the custody or guardianship proceeding that resulted in the removal of the custody or guardianship of the child from the biological mother or biological father, if the man held himself out to be the father of the child at the time of the removal; or

(6) The biological father has entered a permanency plan under title 37, chapter 2, part 4, or under similar provisions of any other state or territory in which the biological father acknowledges paternity of the child.

23

medicine expenses. Father was unable to give a specific figure for how much he spent in support of Mother while she was pregnant. Father also testified that after his arrest and incarceration he was unable to continue to pay for Mother's expenses due to lack of income. The testimony that Father provided prenatal support is uncontradicted and preponderates against the court's finding; accordingly, we reverse the termination of Father's parental rights in the ground of failure to provide prenatal support.

### E.    Best Interest

Once a ground for termination has been proven, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i)[16]

---

[16] Section 36-1-113(i) provides:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

for the courts to follow in determining a child's best interest. The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

In its discussion of the best interest of the children, the court made three specific findings and one finding which addressed each of the statutory factors. The three specific findings, neither of which is specifically challenged by Mother or Father are as follows:

17. The Petitioners have consistently provided the only safe, stable home the Minor Children have ever known. The Petitioners have always put the needs of the Minor Children first unlike the Respondent biological parents. The Petitioners went to great lengths to assist the parents with visitation including taking the Minor Children for consistent visitation at the jail, paying their own money into the Mother and Father's jail accounts, and trying to work with the parents on a set schedule once they were released.

18. Minor Children need stability and permanency. The Petitioners can provide this, but the parents cannot.

19. The Petitioners submitted a favorable home study. (Exhibit 20).

We have reviewed the evidence in the record pertinent to these findings and each is supported by the testimony of Petitioners, day care workers, family friends, co-workers, and Tisha K.'s mother, as well as the information contained in the adoptive home study.

With respect to the findings relative to the factors at Tennessee Code Annotated section 36-1-113(i), Mother does not challenge any specific finding; Father challenges the court's findings as to factors (1), (3), (4) and (5). We address Father's challenges first.

The court made the following findings as to factor (1):

i. The Mother and Father failed to complete tasks and the conditions that lead to the removal of their children still exist today.

---

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

25

ii. The Mother and Father still live a volatile lifestyle involving drugs, domestic violence, and failure to provide stability.

Father argues that "Proof at trial showed that Appellants were no longer incarcerated, had obtained employment and stable housing, were removed from the conduct that resulted in their incarceration and made adjustments to all such necessary conditions in order to allow the minor child to return to their custody." These matters have been addressed in the discussion of compliance with the permanency plan section, *supra*; as held earlier, there is clear and convincing evidence to support these findings, and the evidence cited by Father does not preponderate against the findings.

The court made the following finding as to factor (3):

i. The Mother and Father demanded to have visitation set up on short notice or demanded to speak to the children after they went to bed. The Mother and Father's demands became a direct barrier to an appropriate visitation schedule.

ii. The Father voluntarily failed to visit his own child since he was denied visitation with Kah'nyia, which was not his biological child. He told the Petitioners if he could not see them both, he did not want visitation.

Father argues that he made "every available attempt" to obtain visitation and custody of Darroll Jr. after his release from jail.

The record shows that Father wrote Petitioners a letter in January of 2015, stating that he would no longer be calling Petitioners or the children; he also testified that he had seen Darroll Jr. five or six times since his birth. Further, Tisha K. testified that Father told Petitioners while he was incarcerated that he did not want to see Darroll Jr. if he could not also see Kah'nyia. This evidence supports the finding Father has not maintained regular visitation with the children.

With respect to Mother's visitation, Brett K. testified that the Petitioners attempted to set up a regimented visitation schedule with Mother; that Mother resisted the effort, stating that they were trying to keep the children from her; that Mother would demand visitation on less than a day's notice and get upset when Petitioners would not agree; and despite being told not to call after the children's bedtime, Mother would continually call and ask to speak to them. Brett K.'s testimony supports the court's finding.

The court made the following finding as to factor (4):

i. The Mother and Father admitted in court they have no relationship with [Darroll Jr.]

26

ii. [Father] is not the Father of Kah'nyia, and the Mother's relationship with Kah'nyia is not meaningful. Testimony from the Petitioners and the teachers and daycare workers stated the Minor Child, Kah'yia, had night terrors and was inconsolable at school after visits with the Mother. The Minor Child would only calm down after speaking with the Petitioner. The Minor Child, [Darroll Jr.] has no real relationship with the Mother and Father. Placing the Minor Children back with the parents would put them in substantial risk of physical or psychological harm.

Father argues that the lack of a meaningful relationship between he and Darroll Jr. is due to Petitioners' action in "utilizing both the Davidson County Juvenile Court and the trial court as barriers to between [sic] [Father] and [Darroll Jr.]"; Father cites no evidence in support of this argument. As noted earlier, Father distanced himself from the children beginning with the letter he wrote in January of 2015 and in his statements to Petitioners. The record supports the finding that Father does not have a meaningful relationship with Darroll Jr. and the finding as to this factor is affirmed.

The court made the following finding as to factor (5):

i. The Petitioners have provided the Minor Children with the only safe and stable home they have ever known. The Minor Children continue to thrive under their care.

ii. It would devastate the Minor Children to leave the home of the Petitioners to be returned to volatile parents with whom they have little relationship.

Father argues with respect to this finding that "[a]ny evidence regarding the stability [Petitioners] have provided to [Darroll Jr.] is immaterial based on the evidence of their conduct towards actively prohibiting [Father] from building relationship with his son." The trial court correctly considered this to be material evidence on this factor and we find no error in the court's consideration of the evidence; in addition, the evidence does not support Father's argument that Petitioners prevented him from establishing a relationship with Darroll, Jr.

While not contesting any specific finding, Mother argues that Petitioners did not prove that it was in the best interest of the children to terminate her rights. We have reviewed the record with respect to the court's finding as to the remaining best interest factors and have determined that each finding is supported by clear and convincing evidence.

**IV.  CONCLUSION**

For the foregoing reasons, we reverse the judgment of the trial court terminating Mother and Father's parental rights on the ground of persistence of conditions and Father's parental rights to Darroll Jr. based on the ground of failure to provide prenatal support; we affirm the judgment in all other respects.

_____

RICHARD H. DINKINS, JUDGE